# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| | : | |
| ARSELL LEWIS, JR., | : | |
| | : | Civil Action No. |
| Plaintiff, | : | 04-6063 (NLH)(AMD) |
| | : | |
| v. | : | |
| | : | |
| DEVON BROWN, et al., | : | **OPINION** |
| | : | |
| Defendants. | : | |
| | : | |

**APPEARANCES:**
JEFFREY P. RESNICK
ALAN C. MILSTEIN
LEILY SCHOENHAUS
SHERMAN, SILVERSTEIN, KOHL, ROSE & PODOLSKY, PC
4300 HADDONFIELD ROAD, SUITE 311
PENNSAUKEN, NJ 08109
        *Attorneys for plaintiff*

WILLIAM J. BUCKLEY
PISCIOTTI MALSCH & BUCKLEY PC
30 COLUMBIA TURNPIKE
FLORHAM PARK, NJ 07932

SEAN X. KELLY
SEAN ROBINS
MARKS, O'NEILL, O'BRIEN & COURTNEY, PC
COOPER RIVER WEST
6981 N. PARK DRIVE
SUITE 300
PENNSAUKEN, NJ 08109
        *Attorneys for defendants*

**HILLMAN, District Judge**

        This matter has come before the Court on defendants' motions

for summary judgment on plaintiff's claims that defendants

committed medical malpractice and were deliberately indifferent

to his serious medical needs in violation of the Eighth

Amendment. For the reasons expressed below, defendants' motions

will be granted.

## JURISDICTION

Because plaintiff has brought claims pursuant to 42 U.S.C. § 1983 for alleged violations of his constitutional rights, this Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over plaintiffs' state law claims under 28 U.S.C. § 1367.[1]

## BACKGROUND

### 1.   Facts

On June 29, 2002, plaintiff, Arsell Lewis, Jr., was an inmate at South Woods State Prison when he injured his left heel playing handball.  On July 2, 2002, plaintiff was diagnosed by staff physician, defendant Stephen Hoey, D.O., as having a ruptured Achilles tendon.  Dr. Hoey recommended urgent orthopedic

---

[1]Plaintiff filed his original complaint *pro se*, but he was subsequently appointed *pro bono* counsel.  As of January 20, 2009, however, even though all the parties were under the assumption that plaintiff had advanced a deliberate indifference claim pursuant to § 1983, the Court's review of the amended complaint revealed that it did not contain such a claim, and therefore plaintiff's proffered basis for jurisdiction--§ 1331--was improper.  The Court issued an order to show cause regarding this issue, see Docket No. 103, and following the parties' responses, which explained that the § 1983 claim was inadvertently omitted from the amended complaint, the Court permitted plaintiff to file a second amended complaint to re-assert the federal claim and to properly avail himself of this Court's jurisdiction, see Docket No. 107.
Correspondingly, as noted below, even though plaintiff's federal claim is dismissed, the Court will continue to exercise its supplemental jurisdiction to resolve the remaining state law claim.

evaluation and treatment.  On that same day, plaintiff was transported to defendant Cumberland Orthopedics, P.A. and evaluated by defendant Gerald S. Packman, M.D.  Dr. Packman affirmed that plaintiff was suffering from a ruptured Achilles tendon, and recommended surgery within three weeks.

Plaintiff's surgery did not occur until September 5, 2002, some eight weeks later, when Dr. Mark Pressman at St. Francis Medical Center surgically repaired plaintiff's left Achilles tendon.  A cast was placed on plaintiff's foot, and Dr. Pressman's post-surgical discharge instructions directed that plaintiff receive a follow-up at the orthopedic clinic within two weeks to check the cast.  On September 6, 2002, Dr. Hoey examined plaintiff in the prison infirmary and discharged him to his cell.

The next day, plaintiff returned to the infirmary complaining of swelling of his foot, and left hip and knee pain. Plaintiff was using crutches, and the nurse recorded in the office notes that an attempt would be made to obtain a wheelchair for plaintiff's use.

On September 26, 2002, plaintiff returned to the infirmary on a sick call and was seen by a nurse who is not a named defendant.  Plaintiff stated that he was supposed to have been seen by the orthopedic clinic two weeks after surgery to have his cast removed.  Plaintiff denied any pain or distress, but he asked to have the paperwork started for the orthopedic clinic

follow-up because he was concerned about the length of time it took to schedule his surgery.  A chart note created by defendant Fran Green, RN and dated September 27, 2002 indicates that a visit with the orthopaedic clinic had been scheduled, the appointment scheduler was to call the office to confirm, and that plaintiff was "able to wiggle toes, no swelling prox cast in place."  (Pl. Ex. F at J-00064.)

On October 7, 2002, plaintiff was seen by Dr. Packman in the prison's orthopedic clinic.  Plaintiff states that he asked to have Dr. Packman remove the cast because he was in pain, but Dr. Packman reports that he did not remove the cast because (1) he did not perform the surgery, (2) he did not know the quality of the repair, and (3) he did not have any discharge paperwork from the operating surgeon, who may have mandated special requirements for post-operative care.  Dr. Packman also reports that plaintiff did not make any complaints about his cast, and his examination of the cast revealed that it was not too tight, there were no abrasions or ulcerations around the edge, there was no abnormal smell, the color of plaintiff's toes and legs was normal, there was no abnormal warmth of the skin, and plaintiff could wiggle his toes.

On October 9, 2002, Nurse Green created a chart note summarizing Dr. Packman's consultation report, and indicated that plaintiff was rescheduled for the next orthopedic clinic with the

operative doctor, and St. Francis Medical Center would be called to obtain plaintiff's discharge summary.

On October 24, 2002, plaintiff returned to the orthopedic clinic.  The medical summary notes that "[u]nfortunately patient was lost to follow-up and did not return until 7 weeks post surgery," as "he was scheduled to be seen approximately 1 1/2 weeks post surgery and then again 6 weeks post surgery."  (Pl. Ex. I.)   He was evaluated upon admission, and "he was found to have a full-thickness skin slough[2] in the region of the Achilles tendon with exposed tendon and sutures."  (Id.)  He was transferred to St. Francis Medical Center for antibiotics and wound care.  On October 28, 2002, plaintiff underwent "an extensive debridement[3] of the skin and soft tissue.  A portion of the Achilles was debrided but there appeared to be a portion intact."  (Id.)  Plaintiff was discharged on October 29, 2002.

Following surgery, plaintiff initially required a wheelchair to get around.  He underwent physical therapy, and eventually he was able to walk with the assistance of specialized boots and a cane.  In February 2003, plaintiff underwent reconstructive skin flap surgery.  He currently wears specialized boots and must wear

---

[2]A skin slough is "[n]ecrosed [dead] tissue separated from the living structure." Stedmans Medical Dictionary (27th ed. 2000).

[3]Debridement is the "[e]xcision of devitalized tissue and foreign matter from a wound." Stedmans Medical Dictionary (27th ed. 2000).

a brace on his left ankle when walking.  He also reports that he experiences occasional loss of balance when walking and has difficulty standing for prolonged periods of time.

   2.   **Procedural History**

   On August 19, 2004, plaintiff filed a *pro se* complaint against Devon Brown, who was the Commissioner of the New Jersey Department of Corrections, Kathryn McFarland, who was the Administrator of South Woods State Prison, John Doe, Stephen Hoey, Fran Green, and "Dr. Peckman."  (See Civ. A. No. 04-3962 (FLW).)  In that complaint, plaintiff claimed that these defendants were responsible for the delay in his post-surgical follow-up care, which he claims caused the debridement surgery and his subsequent pain and suffering.  Plaintiff did not specify the legal basis for his claims against these defendants, but plaintiff utilized the form provided by the district court for prisoners filing complaints under 42 U.S.C. § 1983.

   On October 4, 2004, plaintiff filed what he called a "Continuing of Complaint."  That document included medical records and a statement that "Correction Medical Services lost discharge summary report that makes this company and every other parties connected libel obligated for this mishap." (Civ. A. No. 04-3962, Docket No. 2.)  On October 18, 2004, the court instructed the Clerk to deem plaintiff's case as withdrawn and close the file.  (Civ. A. No. 04-3962, Docket No. 4.)  The court

entered this order in response to an October 14, 2004 letter from plaintiff, who stated, "I would like to bring to your attention that I Arsell Lewis Jr. is the plaintiff and would like to take the opportunity to dismiss this Complaint under the Civil Rights Act U.S.C. § 1983.  I'm sorry for putting the courts through this mishap."  (Civ. A. No. 04-3962, Docket No. 3.)  On October 25, 2004, however, plaintiff sent another letter, which stated that his voluntary dismissal letter was in reference to another suit he filed against "the public defender," and that his case regarding the Achilles tendon surgery was dismissed in error. (Civ. A. No. 04-3962, Docket No. 5.)  He accordingly requested that his case be re-opened.  It appears that no action was taken by the court in response to plaintiff's request.

On December 13, 2004, plaintiff re-filed the same form complaint against the same defendants, and indicated that his other case was dismissed "by computer error."  (Docket No. 1 at 3.)  Following the *pro se* prisoner complaint screening process, plaintiff's complaint was filed on the docket on March 24, 2005. By May 2005, plaintiff had properly served Devon Brown, Kathryn McFarland, Stephen Hoey, and Fran Green.  Brown and McFarland moved to dismiss plaintiff's claims against them, and their motion was granted in August 2005.

In September 2005, plaintiff's motion for the appointment of

*pro bono* counsel was granted.[4]  On October 12, 2007, plaintiff and defendants Dr. Packman and Cumberland Orthopedics agreed to amend the caption to name these defendants in place of "Dr. Peckman" and "John Doe."  On June 11, 2008 plaintiff filed an amended complaint, which included Correctional Medical Services ("CMS") as a defendant.  Shortly thereafter, CMS filed a motion to dismiss, and the other defendants filed motions for summary judgment.  As noted above, those motions were denied without prejudice due to the Court's observation that the amended complaint did not contain any federal claims, and thus, the Court was without subject matter jurisdiction to hear the case.  On June 23, 2009, plaintiff subsequently filed a second amended complaint, adding the federal claims that were inadvertently omitted from the amended complaint.  All defendants then refiled their motions for summary judgment.  The Court resolves those motions now.[5]

---

[4]The first attorney appointed to represent plaintiff was withdrawn because she discontinued the practice of law. Plaintiff's current counsel has moved twice to be relieved as counsel, but those motions have been denied.

[5]Plaintiff's case has also involved its reassignment to this Court from District Judge Freda Wolfson, its reassignment to three different magistrate judges, an appeal as to his *in forma pauperis* status, and an administrative termination due to his appeal.

**DISCUSSION**

**A.    Summary Judgment Standard**

Summary judgment is appropriate where the Court is satisfied that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56(c).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  Id.  In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor."  Marino v. Industrial Crating Co., 358 F.3d 241, 247 (3d Cir. 2004)(quoting Anderson, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has

met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id. Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. Anderson, 477 U.S. at 256-57. A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements. Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).

**B.  Analysis**

Dr. Packman, Cumberland Orthopedics and CMS argue that they are entitled to judgment in their favor because plaintiff's claims were filed out-of-time. Alternatively, these defendants, as well as Nurse Green and Dr. Hoey, argue that they are entitled to judgment in their favor because, as a matter of law, plaintiff cannot prove his medical malpractice claims or deliberate indifference to support his Eighth Amendment claims.[6] Plaintiff

---

[6]Defendants also contend that plaintiff failed to exhaust his administrative remedies. Under the Prison Litigation Reform Act, "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The "PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002).
Defendants argue that because plaintiff admits in his December 2004 complaint that he did not present his case to

has opposed defendants' arguments, contending that his claims
against Dr. Packman, Cumberland Orthopedics and CMS were not
filed beyond the two year statute of limitations period.
Plaintiff also argues that proximate causation for his
malpractice claims is for the jury to decide, and he argues that
his evidence is sufficient to support his deliberate indifference
claims.

Plaintiff's claims fail against each defendant for various
reasons.  Each will be addressed in turn.

### 1.    Whether plaintiff's claims were filed out-of-time against Dr. Packman, Cumberland Orthopedics, and CMS

Defendants Dr. Packman, Cumberland Orthopedics, and CMS
argue that plaintiff's complaint against them should be dismissed
because it was not filed within the two year statute of
limitations period for medical malpractice and constitutional

---

prison officials through the grievance procedure or via some
other method of communication, (Docket No. 1 at 7), his claims
should be dismissed for failure to exhaust his administrative
remedies.  Plaintiff counters that he wrote letters to Kathyrn
McFarland, Administrator for South Woods State Prison, and Devon
Brown, Commissioner of the Department of Corrections, some time
during September 2002, but that he did not receive a response.
(Pl. Ex. D at 55-56.)

Whether these letters were sufficient to exhaust his
administrative remedies is defendants' burden to prove.  Ray v.
Kertes, 285 F.3d 287, 295 (3d Cir. 2002) (finding that the PLRA
exhaustion requirement is an affirmative defense, which must be
proved by prison officials, and a prisoner need neither plead nor
prove exhaustion to proceed under the PLRA).  Defendants have
failed to "readily provide the court with clear, typed
explanations, including photocopies of relevant administrative
regulations," id., to show which procedures plaintiff failed to
exhaust. Consequently, this basis for dismissal must be denied.

tort claims.  Plaintiff does not dispute the two year statute of limitations period applicable to his claims.  He argues, however, that his claims should not be dismissed on three bases: the relation back doctrine, the fictitious party rule, and the discovery rule.

For a § 1983 claim the statute of limitations is provided by the state law for personal-injury torts, Wallace v. Kato, 549 U.S. 384, 387 (2007), and in New Jersey, the statute of limitations is two years, Cito v. Bridgewater Twp. Police Dep't, 892 F.2d 23, 25 (3d Cir. 1989); N.J.S.A. 2A:14-2.  Several exceptions to the two-year limit exist, including the relation back doctrine, the discovery rule, and the fictitious party rule. With regard to the relation back doctrine, Federal Civil Procedure Rule 15(c) governs whether an amendment can "relate back" to the filing date of the original complaint.  Rule 15(c) provides that an amendment to a pleading relates back to the date of the original pleading in three instances:

> (A) the law that provides the applicable statute of limitations allows relation back;
>
> (B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out — or attempted to be set out — in the original pleading; or
>
> (C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:

(i) received such notice of the action that it will not be prejudiced in defending on the merits; and

(ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Fed. R. Civ. P. 15(c)(1).

As for the discovery rule, under New Jersey law, tolling the statute of limitations "may be applicable when 'injured parties reasonably are unaware that they have been injured, or, although aware of an injury, do not know that the injury is attributable to the fault of another.'" Maldonado v. Leeds, 865 A.2d 741 (N.J. Super. App. Div. 2005) (citing Baird v. Am. Med. Optics, 713 A.2d 1019 (N.J. 1998)); see also Savage v. Old Bridge-Sayreville Medical Group, P.A., 633 A.2d 514, 518 (N.J. 1993) (stating that knowledge of fault for purposes of the discovery rule requires "only the awareness of facts that would alert a reasonable person exercising ordinary diligence that a third party's conduct may have caused or contributed to the cause of the injury and that conduct itself might possibly have been unreasonable or lacking in due care."). "The discovery rule is essentially a rule of equity." Abboud v. Viscomi, 543 A.2d 29, 32 (N.J. 1988) (citing Lopez v. Swyer, 300 A.2d 563 (N.J. 1973)). Determining whether it applies requires "identification, evaluation, and weighing of the equitable claims of the parties." Id. (citing Vispisiano v. Ashland Chem. Co., 527 A.2d 66 (N.J.

13

1987)).  It is plaintiff's burden to explain why he reasonably could not have discovered his cause of action in time to comply with the limitation period so as to justify the tolling of the statute of limitations.  Phillips v. Gelpke, 921 A.2d 1067, 1076 (N.J. 2007) (citation omitted).

Under the fictitious party rule, the statute of limitations may be tolled if the plaintiff invokes the rule before the expiration of the limitations period.  DeRienzo v. Harvard Industries, Inc., 357 F.3d 348, 353 (3d Cir. 2004) (citing N.J.S.A. 2A:14-2 and N.J. R. 4:26-4).  New Jersey Civil Procedure Rule 4:26-4 permits a plaintiff to amend his complaint to identify the proper party, as long as a John Doe fictitious designation was included for that specific category of defendant.  See Yarchak v. Trek Bicycle Corp., 208 F. Supp. 2d 470, 489 (D.N.J. 2002) (citing Mancuso v. Neckles, 747 A.2d 255, 261 n.1 (N.J. 2000) and discussing N.J. R. 4:26-4) ("[T]he fictitious party rule permits a plaintiff to preserve a claim against as yet unidentified potential defendants who may have contributed to plaintiff's injuries.").  The Rule provides,

> In any action, irrespective of the amount in controversy, other than an action governed by R. 4:4-5 (affecting specific property or a res), if the defendant's true name is unknown to the plaintiff, process may issue against the defendant under a fictitious name, stating it to be fictitious and adding an appropriate description sufficient for identification. Plaintiff shall on motion, prior to judgment, amend the complaint to state defendant's true name, such motion to be accompanied by an affidavit

14

> stating the manner in which that information was
> obtained. If, however, defendant acknowledges his or
> her true name by written appearance or orally in open
> court, the complaint may be amended without notice and
> affidavit. No final judgment shall be entered against a
> person designated by a fictitious name.

N.J. Civ. Pro. R. 4:26-4.

Here, plaintiff filed his complaint in this matter on December 13, 2004. The complaint does not name Cumberland Orthopedics as a defendant in the caption or in the body of the complaint; it names "Peckman, Dr." in the caption, and contains substantive allegations against "Dr. Peckman"; it contains a "John Doe" in the caption; and it does not name CMS as a defendant in the caption, but it contains substantive allegations against CMS in the body of the complaint. None of these parties were ever officially served. In October 2007, Dr. Packman and Cumberland Orthopedics became part of the case through a consent order to amend the caption, through which "Dr. Peckman" became Dr. Packman, and Cumberland Orthopedics was substituted for "John Doe." They filed their answer to the complaint in November 2007, asserting the statute of limitations as an affirmative defense.

In June 2008, CMS became a defendant through plaintiff's amended complaint. Plaintiff was permitted to file an amended complaint naming CMS as a defendant because he claimed that April 2008 depositions of defendants Dr. Hoey and Nurse Green revealed for the first time facts providing a basis for claims against

15

CMS.  CMS immediately filed a motion to dismiss based on the two-year statute of limitations.

With regard to Dr. Packman and Cumberland Orthopedics, plaintiff argues that the relation back doctrine saves his claims against them, and the fictitious party rule also saves his claims against Cumberland Orthopedics.  Assuming for the purposes of responding to defendants' motions that plaintiff became aware of his claims against Dr. Packman and Cumberland Orthopedics on October 24, 2002 when he was admitted to the hospital for debridement, and recognizing that his December 13, 2004 complaint is beyond the two-year limitation, plaintiff argues that his December 2004 complaint should relate back to his August 19, 2004 complaint, which he claims was dismissed in error.  If the December 2004 complaint is permitted to relate back to his August 19, 2004 complaint, plaintiff argues that his claims against Dr. Packman and Cumberland Orthopedics are not time-barred. Additionally, plaintiff argues that regardless of whether he acted diligently to determine the identity of Cumberland Orthopedics, Cumberland Orthopedics has not been prejudiced, and therefore the "John Doe" in his complaint saves his claim against Cumberland Orthopedics.

With regard to CMS, plaintiff argues that the discovery rule saves his claims against CMS.  Plaintiff argues that he did not discover facts to support claims against CMS until April 2008.

Accordingly, plaintiff argues that his claims against CMS were tolled until that time, and the filing of the June 2008 amended complaint against CMS was timely.

Prior to substantively analyzing the parties' arguments, it must be noted that courthouse administrative errors and the issues relating to the appointment of *pro bono* counsel appear to have caused or exacerbated these statute of limitations issues. First, a review of the original, hard copy case file of plaintiff's August 2004 case, Civil Action No. 04-3962, reveals that plaintiff's case was indeed terminated in error, as he claims.

The letter plaintiff sent to the clerk requesting the dismissal of "this complaint under the Civil Rights Act 42 U.S.C. § 1983" did not include a docket number.  His letter was received in the chambers of Judge Jerome B. Simandle because plaintiff addressed the envelope to Judge Simandle's Post Office mailbox, rather than to the mailbox of Judge Wolfson, to whom his case was assigned.  It appears that someone other than plaintiff wrote "04cv3962(FLW)" on plaintiff's letter, and it was docketed, along with the envelope.  The notation of the 04-3962 docket number is understandable, because that action was plaintiff's only case on the court's docketing system, and it concerned a § 1983 claim.

What is missing from the electronic docketing system, however, is the paper attached to plaintiff's letter, which is

17

the first page of the form prisoners use to advance § 1983
claims.  On that page, plaintiff hand wrote the following:
"Arsell Lewis Jr. v. Yvonne Smith Segars, Robert J. Moran, Alicia
Hubbard."  Although it does not appear that plaintiff's case
against these defendants was ever filed on the docket, thus
adding to the confusion, it is clear that plaintiff did not
intend to voluntarily dismiss his claims relating to his Achilles
tendon surgery.

Compounding this problem is the lack of the court's response
to plaintiff's notice to the court a week later that his case had
been terminated in error.  Apparently because he received no
response, plaintiff simply chose to refile his case.  What
plaintiff, proceeding *pro se* at the time, did not realize was
that statute of limitations issues would be implicated by the
refiling.

Further complicating matters was: the *pro se* prisoner
complaint screening process, which caused his December 13, 2004
complaint not to be docketed until March 25, 2005; the granting
of plaintiff's April 19, 2005 motion for *pro bono* counsel not
until October 25, 2005; the appointment of *pro bono* counsel who
discontinued the practice of law during her representation of
plaintiff; the appointment of new pro bono counsel, who
subsequently asked to be relieved as counsel on two occasions;
and the filing of an amended complaint which inadvertently left

18

out plaintiff's § 1983 claims, which caused this Court to issue
an order to show cause relating to subject matter jurisdiction.

This confluence of errors and procedural speed bumps cannot
be ignored when considering defendants' motions.  As a primary
matter, because (1) plaintiff's August 19, 2004 complaint was
filed within the two-year statute of limitations period, (2) that
complaint was dismissed by administrative error and not reopened
even after plaintiff informed the court about the error, (3) the
December 13, 2004 complaint was identical to the August 19, 2004
complaint, and (4) the second, current action was simply
plaintiff's way to correct the error made by the court, this
Court finds that for statute of limitations purposes, plaintiff's
complaint was filed on August 19, 2004.

That finding, however, does not automatically negate
defendants' motions.  After the filing of his complaint,
plaintiff was required to prosecute his case according to the
Federal Rules of Civil Procedure, even as a *pro se* litigant.
Although *pro se* complaints, "however inartfully pleaded, must be
held to less stringent standards than formal pleadings drafted by
lawyers," Estelle v. Gamble, 429 U.S. 97, 107 (1976), *pro se*
litigants "must still plead the essential elements of [their]
claim and [are] not excused from conforming to the standard rules
of civil procedure," McNeil v. United States, 508 U.S. 106, 113
(1993) ("[W]e have never suggested that procedural rules in

19

ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel . . . .").

With regard to CMS, plaintiff did not name CMS as a defendant until his third complaint, filed on June 11, 2008. Plaintiff contends that this failure was because he did not discover facts to support a claim against CMS until April 2008. Plaintiff's explanation, however, does not comport with the discovery rule. The "focus of a discovery rule inquiry should center upon an injured party's knowledge concerning the origin and existence of his injuries as related to the conduct of others. Knowledge of the exact identity of who caused the injury is not required." Cruz v. City of Camden, 898 F. Supp. 1100, 1113-14 (D.N.J. 1995) (citations omitted). Thus, it is plaintiff's discovery of his injury, rather than the discovery of who inflicted his injury, which triggers the statue of limitations. Plaintiff knew as of October 24, 2002 that, for whatever reason and by whatever party, he was injured. Plaintiff waited until almost six years after "discovering" his injury to bring his claim against CMS for that injury. The discovery rule does not absolve such a delay.[7]

Although not specifically argued by plaintiff with regard to

_____

[7]CMS was never officially served. Instead, following receipt of a courtesy copy of plaintiff's complaint from plaintiff's counsel, CMS moved to dismiss based on the statute of limitations.

CMS, the relation back doctrine and fictitious party rule also do not save plaintiff's claims against CMS. As set forth above, Rule 15(c)(1)(a)[8] permits a pleading to relate back to the date of the original pleading when permitted by state law. New Jersey law permits a plaintiff to amend his complaint to identify the proper party as long as a John Doe fictitious designation was included for that specific category of defendant. This rule serves to ameliorate the problem of a plaintiff "discovering" he is injured, but not yet being aware of sufficient facts to name all the parties potentially responsible for that injury.

Here, even though plaintiff included a "John Doe" in his August and December complaints, the fictitious party rule is inapplicable for several reasons. First, simply pleading a John Doe, without any "appropriate description sufficient for identification" is improper. See N.J. Civ. Pro. R. 4:26-4. Second, for plaintiff to avail himself of the fictitious party rule, the defendant's true name must have been unknown to plaintiff. See id. Plaintiff, however, knew of CMS's identity from the inception of his case. Both the August and December 2004 complaints name CMS specifically in the body of his complaint, alleging that CMS was responsible for his "mishap." Moreover, in October 2007 plaintiff substituted defendant Cumberland Orthopedics for "John Doe," thus evidencing that the

---

[8]Fed. R. Civ. P. 15(c)(1)(b) and (c) are not available to plaintiff with regard to CMS.

fictitious name was not a placeholder for CMS.[9]

Consequently, because no tolling exception to the applicable statute of limitations saves plaintiff's claims against CMS, CMS's motion to dismiss plaintiff's case against it must be granted.[10]

With regard to Dr. Packman and Cumberland Orthopedics, plaintiff's August 2004 complaint asserts a claim against "Dr. Peckman."  It does not contain any mention of Cumberland Orthopedics or Dr. Packman's practice group in general.  In October 2007, Dr. Packman entered into a consent order with plaintiff to substitute his properly-spelled name.  In that same consent order, Cumberland Orthopedics agreed to be substituted for John Doe.  On November 20, 2007, Dr. Packman and Cumberland Orthopedics filed their answer to plaintiff's complaint.  In their answer, Dr. Packman and Cumberland Orthopedics asserted as an affirmative defense the statute of limitations.

Plaintiff argues that the relation back doctrine saves his claims against Dr. Packman, and the relation back doctrine, through the fictitious party rule, saves his claims against Cumberland Orthopedics.  Neither doctrine saves plaintiff's

---

[9]See, however, _infra_ p. 26, which discusses how even though Cumberland Orthopedics was substituted for John Doe, plaintiff perhaps intended John Doe to represent a CMS administrator named Abu Ahsan, M.D.

[10]Even if plaintiff's claims against CMS were not barred by the statute of limitations, his claims fail substantively as well.  _See infra_ notes 16 and 20.

claims.

It is clear that plaintiff asserted his claims against Dr. Packman, despite the misspelling of his name, in August 2004, prior to the running of the statute of limitations.  Plaintiff, however, never served Dr. Packman with his complaint.  It is unclear from the record how it came to be that Dr. Packman consented to appear in the case in October 2007, but it was not until that time did Dr. Packman become aware of the case against him.  (See Def. Ex. O, Affidavit of Dr. Packman.)  Similarly, plaintiff never served Cumberland Orthopedics with his complaint--Cumberland Orthopedics was not even mentioned in plaintiff's first two complaints--and Cumberland Orthopedics only appeared in the action in October 2007 as a result of the consent order to amend the caption.[11]

For the relation back doctrine to apply to Dr. Packman and Cumberland Orthopedics, the plaintiff has the burden of demonstrating that the amendment (1) arose out of the claim set out in the original pleading, (2) prior to the running of the statute of limitations period, or within 120 days of the filing of his complaint, Dr. Packman and Cumberland Orthopedics received

_____

[11]These defendants do not make any motion based on improper service.  Ostensibly this is because their appearance by consent order waives any service issues.  Under New Jersey Court Rules, which are applied in federal court when serving an individual in this judicial district, see Fed. R. Civ. P. 4(e), "[a] general appearance . . . shall have the same effect as if the defendant had been properly served," N.J. Ct. R. 4:4-6.

notice of the action, (3) Dr. Packman and Cumberland Orthopedics knew or should have known that the action would have been brought against them, but for a mistake concerning the their proper identity, and (4) Dr. Packman and Cumberland Orthopedics would not be prejudiced.  See Fed. R. Civ. P. 15(c)(1); N.J. Ct. R. 4:9-3; Arroyo v. Pleasant Garden Apartments, 14 F. Supp. 2d 696, 700 (D.N.J. 1998) (discussing that New Jersey Court Rule 4:9-3 does not allow a plaintiff to add a new defendant to the complaint unless that defendant received either actual or constructive notice of the law suit before the statute of limitations period expired, but that under the more liberal Federal Civil Procedure Rule 15(c)(1), a plaintiff has a window of 120 days from the filing of the original complaint during which the defendant must receive notice; also stating that it is plaintiff's burden to establish these elements).

Plaintiff argues that neither Dr. Packman nor Cumberland Orthopedics would be prejudiced by allowing his claims to proceed against them.  Even if that were true, which defendants argue to the contrary,[12] plaintiff has failed to demonstrate that Dr. Packman or Cumberland Orthopedics learned of plaintiff's case by October 24, 2004, or any time during the remainder of 2004, or in the years 2005, 2006 and most of 2007.  "[T]he principle of

---

[12]For example, the nurse who was present in the room when Dr. Packman examined plaintiff on October 7, 2002, and would have heard whether plaintiff made complaints about his cast, has since passed away.

repose inherent in the statute of limitations is necessarily diluted when an action is instituted beyond the statutory period after the defendant's actionable conduct." Fox v. Passaic General Hospital, 363 A.2d 341, 344 (N.J. 1976). Here, the all the leniency afforded to a *pro se* litigant, and all the considerations concerning the complicated procedural history, do not absolve plaintiff's failure to provide evidence that he notified these defendants of his claims within a reasonable time mandated by the law and court rules. To hold otherwise would subvert the purposes of the statute of limitations.[13]

The fictitious party rule is also unavailing to save plaintiff's claims against Cumberland Orthopedics for the same reason it failed against CMS.[14] Simply pleading a John Doe,

----

[13]Plaintiff was appointed his first *pro bono* counsel in October 2005. By that point, the time for the relation back doctrine to apply to plaintiff's claims against Dr. Packman and Cumberland Orthopedics had already expired. It appears that pursuant to the court's *pro se* prisoner litigation screening order, see Docket No. 2, the court directed summonses to be issued to all defendants, and the U.S. Marshal was to serve the summonses along with the complaint. Service was executed as to defendants Devon Brown, Kathryn McFarland, Dr. Hoey and Nurse Green. There is no evidence in the record that service was executed or failed as to "Dr. Peckman." Further, the address provided by plaintiff for "Dr. Peckman" was that of the prison, rather than at Cumberland Orthopedics. (Docket No. 1 at 10.) Again, even though plaintiff was proceeding *pro se*, he is still required to perform the basic requirements of prosecuting his case, including making sure that all defendants named in his complaint are properly served.

[14]Even though Cumberland Orthopedics consented to the amendment of the caption to be named in the place of John Doe, it retained its right to challenge plaintiff's claims against it

without any "appropriate description sufficient for identification" is improper, and plaintiff knew of Dr. Packman's relationship with Cumberland Orthopedics because he went to the Cumberland Orthopedics' office in July 2002.  See N.J. Civ. Pro. R. 4:26-4; Mears v. Sandoz Pharmaceuticals, Inc., 693 A.2d 558, 562-63 (N.J. Super. Ct. App. Div. 1997) ("If a plaintiff did not use diligence, and a court still permitted him or her to amend his or her original complaint to name a previously unknown defendant, it would not only fail to penalize delay on the plaintiff's part, but would also disregard considerations of essential fairness to the defendant, thereby violating the purpose behind the statute of limitations. . . . . There cannot be any doubt that a defendant suffers some prejudice merely by the fact that it is exposed to potential liability for a lawsuit after the statute of limitations has run." (internal quotations and citations omitted)).  Further, in the papers attached to his complaint, plaintiff described "John Doe" as "Administrator for CMS," which undermines any argument that plaintiff intended the John Doe to substitute for Dr. Packman's practice group.[15] (Docket No. 1 at 10.)  Consequently, plaintiff's claims against Dr. Packman and Cumberland Orthopedics are barred by the

_____

through its affirmative defense in its answer.

    [15]It appears that next to "John Doe Administrator" is the name "Abu Ahsan, M.D. Administrator."  This also evidences that plaintiff did not intend "John Doe" to represent Cumberland Orthopedics.

applicable statute of limitations.

**2.  Whether defendants Dr. Hoey and Nurse Green are entitled to summary judgment**

Defendants Dr. Hoey and Nurse Green argue that they are entitled to summary judgment in their favor on plaintiff's deliberate indifference and medical malpractice claims against them.

### a. *Deliberate indifference claim*

The Eighth Amendment proscription against cruel and unusual punishment requires that inmates are provided with adequate medical care.  To establish a violation of his Eighth Amendment right to adequate medical care, plaintiff must show (1) a serious medical need, and (2) acts or omissions by prison officials that indicated deliberate indifference to that need.  Estelle v. Gamble, 429 U.S. 97, 103-04 (1976); Natale v. Camden County Corr. Facility, 318 F.3d 575, 582 (3d Cir. 2003).

**(1)  Serious medical need**

To prove his claim, plaintiff must first show that he had a serious medical need.  "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'"  Hudson v. McMillian, 503 U.S. 1, 9 (1992).  A serious medical need is a need diagnosed by a physician that the physician believes to require medical treatment, or a need that is "so obvious that a

lay person would easily recognize the necessity for a doctor's attention." Monmouth County Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987) (citation omitted); see also Atkinson v. Taylor, 316 F.3d 257, 273 (3d Cir. 2003). Additionally, the medical need is considered serious where denial or delay causes an inmate to suffer a life-long handicap or permanent loss. Monmouth County, 834 F.2d at 347.

Here, defendants do not contest that plaintiff required treatment for a serious medical need.

**(2)  Deliberate indifference**

Plaintiff must also show that defendant's behavior constituted deliberate indifference to his serious medical need. "Deliberate indifference" is more than mere malpractice or negligence; it is a state of mind equivalent to reckless disregard of a known risk of harm. Farmer v. Brennan, 511 U.S. 825, 837-38 (1994). Furthermore, a prisoner's subjective dissatisfaction with his medical care does not in itself indicate deliberate indifference. Andrews v. Camden County, 95 F. Supp. 2d 217, 228 (D.N.J. 2000). Similarly, "mere disagreements over medical judgment do not state Eighth Amendment claims." White v. Napoleon, 897 F.2d 103, 110 (3d Cir. 1990). "Courts will disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment . . . [which] remains a question of sound professional judgment." Inmates of Allegheny County

Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979) (internal quotation and citation omitted).  Even if a doctor's judgment concerning the proper course of a prisoner's treatment ultimately is shown to be mistaken, at most what would be proved is medical malpractice and not an Eighth Amendment violation.  Estelle, 429 U.S. at 105-06; White, 897 F.3d at 110.

The Third Circuit has found deliberate indifference where a prison official: (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment for non-medical reasons; or (3) prevents a prisoner from receiving needed or recommended treatment.  See Rouse, 182 F.3d at 197.  The court has also held that needless suffering resulting from the denial of simple medical care, which does not serve any penological purpose, violates the Eighth Amendment.  Atkinson, 316 F.3d at 266; see also Monmouth County, 834 F.2d at 346 ("[D]eliberate indifference is demonstrated '[w]hen . . . prison authorities prevent an inmate from receiving recommended treatment for serious medical needs or deny access to a physician capable of evaluating the need for such treatment.'"); Durmer v. O'Carroll, 991 F.2d 64 (3d Cir. 1993); White v. Napoleon, 897 F.2d 103 (3d Cir. 1990).

In this case, plaintiff has not provided any evidence that Dr. Hoey or Nurse Green were deliberately indifferent to plaintiff's serious medical need.  The only interaction Dr. Hoey

29

had with plaintiff was: (1) on July 2, 2002, he diagnosed plaintiff's heel injury as a ruptured Achilles tendon and recommended urgent orthopedic evaluation and treatment, (2) on September 6, 2002, he examined plaintiff the day after his repair surgery, and discharged him to his cell, and (3) on October 29, 2002 following his debridement, he admitted plaintiff to the infirmary for pain and provided medicine for pain.  The only interaction Nurse Green had with plaintiff was: (1) on September 27, 2002, she wrote a chart note recording that a visit with orthopedics had been scheduled, the appointment scheduler was to call the office to confirm, and that plaintiff was "able to wiggle toes, no swelling prox cast in place," (2) on October 9, 2002, she created a chart note summarizing Dr. Packman's consultation report, and indicated that plaintiff was rescheduled for the next orthopedic clinic with the operative doctor, and St. Francis Medical Center would be called to obtain plaintiff's discharge summary.  Plaintiff has not provided any other evidence relating to these defendants.

This evidence does not demonstrate how Dr. Hoey's and Nurse Green's interaction with plaintiff constitutes "a state of mind equivalent to reckless disregard of a known risk of harm." Further, plaintiff does not even connect Dr. Hoey's and Nurse Green's treatment of him to his skin infection.  Accordingly, without any evidence that Dr. Hoey and Nurse Green's conduct

constituted deliberate indifference to plaintiff's serious

medical need, summary judgment must be entered in their favor.[16]

_____

[16]As noted above, even if the statute of limitations did not preclude plaintiff's claims against CMS, Dr. Packman, and Cumberland Orthopedics, his deliberate indifference claims would fail against them as well.  With regard to CMS, in order to prove an Eighth Amendment violation against CMS, Plaintiff "must provide evidence that there was a relevant [CMS] policy or custom, and that the policy caused the constitutional violation[s] [plaintiff] allege[s]."  Natale v. Camden County Correctional Facility, 318 F.3d 575, 584 (3d Cir. 2003) (holding that because *respondeat superior* or vicarious liability cannot be a basis for liability under 42 U.S.C. § 1983, a corporation under contract with the state cannot be held liable for the acts of its employees and agents under those theories).  Plaintiff has not articulated or provided evidence of a policy or custom of CMS which caused plaintiff's skin sloughs and debridment surgery. Plaintiff simply makes an unsupported statement that "CMS's scheduling procedure and customs regarding post-surgical care constitute deliberate indifference."  (Pl. Opp. at 16.)  Without any evidence regarding the scheduling procedures and customs regarding post-surgical care, it cannot be determined whether those policies and/or customs constituted reckless conduct by CMS and caused his injury.  Plaintiff may subjectively feel that CMS was responsible for his injury because of the delay in his follow-up care, but that is insufficient to support a deliberate indifference claim.

With regard to Dr. Packman, plaintiff's only interaction with Dr. Packman was on July 2, 2002, when he affirmed that plaintiff was suffering from a ruptured Achilles tendon, and recommended surgery within three weeks, and on October 7, 2002, when plaintiff was seen by Dr. Packman in the prison's orthopedic clinic.  Plaintiff states that he asked to have Dr. Packman remove the cast because he was in pain, but Dr. Packman reports that he did not remove the cast because (1) he did not perform the surgery, (2) he did not know the quality of the repair, and (3) he did not have any discharge paperwork from the operating surgeon, who may have required special requirements for post-operative care.  Dr. Packman also reports that plaintiff did not report any complaints about his cast, and his examination of the cast revealed that it was not too tight, there were no abrasions or ulcerations around the edge, there was no abnormal smell, the color of plaintiff's toes and legs was normal, there was no abnormal warmth of the skin, and plaintiff could wiggle his toes.

Plaintiff does not demonstrate how Dr. Packman's conduct was

## 2.   *Medical malpractice claim*[17]

Plaintiff also alleges that Dr. Hoey and Nurse Green committed medical malpractice.  Negligence is conduct which falls below a standard recognized by the law as essential to the protection of others from unreasonable risks of harm.  Sanzari v. Rosenfeld, 167 A.2d 625, 628 (N.J. 1961).  "A medical malpractice case is a kind of tort action in which the traditional negligence elements are refined to reflect the professional setting of a physician-patient relationship."  Verdicchio v. Ricca, 843 A.2d 1042, 1055 (N.J. 2004).  It is well-established in New Jersey that the general standard of care a physician is required to

_____

reckless.  Further, plaintiff provides no evidence that Dr. Packman intentionally refused to provide medical assistance, delayed necessary medical treatment for non-medical reasons, or prevented plaintiff from receiving needed or recommended treatment.  Instead, the record reveals that because of medical considerations and plaintiff's well-being, cast removal did not occur on that day, and Dr. Packman felt it was prudent to not remove the cast until he had the discharge orders from St. Francis Medical Center.  Despite plaintiff's contention that this constituted deliberate indifference, plaintiff has not provided any proof to support such a claim.

With regard to Cumberland Orthopedics, plaintiff has not articulated how that corporate entity could be liable for an Eighth Amendment violation.

[17]As noted above, even though the only claims remaining are based on state law, due to the vintage of this case, the Court has chosen to continue exercising its supplemental jurisdiction to resolve the remaining state law claims.  See Growth Horizons, Inc. v. Delaware County, Pa., 983 F.2d 1277, 1284-85 (3d Cir. 1993) (stating that as the statute makes clear, the decision to exercise supplemental jurisdiction over remaining state law claims pursuant to 28 U.S.C. § 1367 is committed to the discretion of the district court).

exercise in the diagnosis and treatment of a patient is that degree of care, skill and knowledge which is ordinarily possessed by the average member of the medical profession acting under similar circumstances.  <u>Mottola v. City of Union City</u>, 2007 WL 2079939, *2 (D.N.J. 2007) (citing <u>Walck v. Johns-Manville Products Corp.</u>, 56 N.J. 533 (1970)).

A plaintiff in a medical malpractice action must prove: (1) the applicable standard of care, (2) that a deviation has occurred, and (3) that the deviation proximately caused the injury.  <u>Id.</u> at 1056 (citations omitted).  In order to prove the first two elements, a plaintiff must present testimony by an expert witness.  <u>Sanzari</u>, 167 A.2d at 628.  This is because a jury does not have the technical training necessary to determine the applicable standard of care, and it cannot, without more, form a valid judgment as to whether the defendant's conduct was unreasonable under the circumstances.  <u>Id.</u>  If the plaintiff does not advance expert testimony establishing an accepted standard of care, it is proper for the court to grant a dismissal of the plaintiff's case.  <u>Id.</u>

One exception to the expert requirement is the common knowledge doctrine.  "The basic postulate for the application of the common knowledge doctrine in a malpractice action is that the issue of negligence is not related to technical matter peculiarly within the knowledge of the licensed practitioner."  <u>Rosenberg v.</u>

Cahill, 492 A.2d 371, 374-75 (N.J. 1985) (citation omitted).
"The most appropriate application of the common knowledge
doctrine involves situations where the carelessness of the
defendant is readily apparent to anyone of average intelligence
and ordinary experience."   Id.

The common knowledge doctrine has been applied where a
dentist has pulled the wrong tooth, a chiropractor has broken a
patient's ribs during manipulation, and a doctor has misread a
pregnancy test.   See Hubbard v. Reed, 774 A.2d 495 (N.J. 2001);
Palanque v. Lambert-Woolley, 774 A.2d 501 (N.J. 2001); Janelli v.
Keeper, 721 A.2d 1036 (N.J. Super. Ct. Law Div. 1998); cf. LiPira
v. Maron, 2009 WL 62926, 1 (N.J. Super. Ct. App. Div. Jan. 12,
2009) (rejecting plaintiff's contention that the common knowledge
doctrine applied to the development of a bone infection in her
jaw secondary to dental implant procedures; stating that in
contrast to cases where there is "some readily identifiable
negligent act or omission that caused the injury--the surgeon
left a foreign object in the body, the dentist extracted the
wrong tooth, the plastic surgeon used a caustic agent--[t]he
severity of plaintiff's jaw infection following her dental
implants is simply a surgical complication that can occur in the
absence of negligence"; and finding that the trial judge did not
err in determining that an expert opinion on a deviation from the
standard of care was required).

Plaintiff argues that the common knowledge doctrine is applicable to his claims against Dr. Hoey and Nurse Green. Plaintiff contends that Dr. Hoey's position as staff physician and Nurse Green's status as the nurse practitioner assigned to the facility where plaintiff was housed can be considered by a jury, and "in the light of their common knowledge and experience," they "may conclude that the defendants were not acting within the standard of care when they failed to ensure that the instructions set forth by Dr. Pressman's discharge summary were followed." (Pl. Opp. at 7.)  Plaintiff continues, "[d]ue to defendants' inaction, plaintiff's ankle was not examined until seven weeks post-surgery, at which time gangrene[18] was discovered.  Given the lack of technical training needed in consideration of this matter, a jury is competent to determine the applicable standard of care.  A jury would easily conclude gangrene should not go undiscovered or even result from a ruptured Achilles tendon."  (Id. at 7-8.)

In this case, it does not take specialized knowledge by a jury to understand that the intended result of an Achilles tendon rupture repair is not skin sloughs and a subsequent debridement surgery.  Further, it does not take specialized knowledge to understand that a patient's surgical site should be examined after surgery, and that the failure to examine the site until

---

[18]None of the medical records use the term "gangrene."

35

seven weeks post-surgery is negligence.  This situation is not
simply a surgical complication that occurred in the absence of
negligence, but rather plaintiff's condition occurred because of
the prison's medical staff's negligence in failing to follow-up
with plaintiff's post-surgical care.  Allowing plaintiff's
sutured wound to fester in a cast for seven weeks without
observation is akin to the obvious negligence in leaving a sponge
in the body or pulling the wrong tooth.

The application of the common knowledge doctrine does not
save plaintiff's claims against Dr. Hoey and Nurse Green,
however, because plaintiff has not articulated how Dr. Hoey and
Nurse Green specifically failed in their duties.  It is unclear
from the record what is the protocol for following-up on
surgeries performed on prisoners outside of the prison, and
plaintiff has not presented any evidence that follow-up for his
care was the specific responsibility of Dr. Hoey or Nurse Green.
A general statement that doctors and nurses in the prison
infirmary should have secured the St. Francis Medical Center's
discharge paperwork and implemented its recommendations is
insufficient to link Dr. Hoey and Nurse Green to any negligence
on their part.[19]  Although it is clear that the prison medical

_____

[19]Even if plaintiff did not advocate for the application of
the common knowledge doctrine, his expert, although stating that
the standard of care had been deviated from, does not connect the
deviation to Dr. Hoey or Nurse Green.  (See Pl. Opp. at 7, citing
Ex. E, wherein Dr. Larry Rosenberg opined that plaintiff

department failed plaintiff, and that system failure caused his injuries,[20] Dr. Hoey and Nurse Green cannot be held to be individually responsible.  Accordingly, Dr. Hoey and Nurse Green are entitled to summary judgment on plaintiff's negligence claims against them.[21]

---

"remained casted without wound evaluation for an excessive period of time," and "deviation from the standard of care occurred when the patient's continued complaints of swelling and discomfort were not treated by a timely wound inspection and or evaluation.")

[20]Plaintiff argues that causation is for the jury to decide based on the substantial factor test.  See Verdicchio v. Ricca, 843 A.2d 1042, 1056 (N.J. 2004) (explaining that the "substantial factor test allows the plaintiff to submit to the jury not whether 'but for' defendant's negligence the injury would not have occurred but 'whether the defendant's deviation from standard medical practice increased a patient's risk of harm or diminished a patient's chance of survival and whether such increased risk was a substantial factor in producing the ultimate harm.' Once the plaintiff demonstrates that the defendant's negligence actually increased the risk of an injury that later occurs, that conduct is deemed to be a cause 'in fact' of the injury and the jury must then determine the proximate cause question: whether the increased risk was a substantial factor in bringing about the harm that occurred" (citation omitted)).  The third element in establishing a medical malpractice claim is irrelevant, however, without first proving the other two.

[21]Plaintiff's medical malpractice claims, if not barred by the statute of limitations, would fail as against CMS, Cumberland Orthopedics, and Dr. Packman for similar reasons.  First, without any viable medical malpractice claims against employees of CMS, CMS cannot be liable for medical malpractice under vicarious liability principles.  The same holds true for Cumberland Orthopedics.  Further, plaintiff has not presented any evidence as to these entities' liability for their own alleged negligence. With regard to Dr. Packman, plaintiff's expert states that Dr. Packman deviated from the standard of care because when he saw plaintiff 31 days post-operation, he should have windowed the cast to observe the wound.  Plaintiff's expert continues, however, to state that plaintiff's skin condition became irreversible around ten days to two weeks after the Achilles

## CONCLUSION

As noted by the physicians at St. Francis Medical Center, plaintiff's problems occurred because he was "unfortunately lost to follow-up."  Being "lost to follow-up" was the result of the prison's medical department's collective negligence in failing to keep track of plaintiff once he was released back into the general population after his Achilles tendon surgery.  Although sometimes skin infections occur after surgery even with top-notch post-surgical care, it is clear that the extent of plaintiff's injuries would have been lessened had the medical staff obtained and followed the orthopedic surgeon's post-operative instructions.  As discussed above, however, plaintiff has not been able to support his claims against any individual defendant.

---

tendon repair, and possibly even earlier. (Pl. Ex. E at 18.)  He further states, "I would have predicted if Dr. Packman had opened the cast that day [October 7, 2002] he would have found the same kind of problem that prompted this patient's admission on October 24, '02."  (Id. at 20.) Thus, plaintiff's own expert found that any deviation from the standard of care by Dr. Packman when he examined plaintiff did not proximately cause the injury.  This finding corroborates the application of the common knowledge doctrine, and the finding that the system had already failed plaintiff prior to his visit with Dr. Packman.  Further, as with Dr. Hoey and Nurse Green, plaintiff has not provided any evidence that it was Dr. Packman's specific responsibility within the prison medical department to timely follow-up with plaintiff after his surgery.  Consequently, even if the Court were to find that the substantial factor test for determining causation was applicable, plaintiff has not provided any evidence to support a jury finding that Dr. Packman's deviation from the standard of care increased plaintiff's risk of harm, and that increased risk was a substantial factor in producing the ultimate harm.  Without such evidence, plaintiff's medical malpractice claim against Dr. Packman fails as a matter of law.

Thus, while the Court is sympathetic to plaintiff's plight--a serious skin infection, the two surgeries related to that infection, and his continuing problems--plaintiff's claims against defendants fail as a matter of law.

An appropriate Order will be entered.


Date: March 30, 2010                       s/ Noel L. Hillman

At Camden, New Jersey              NOEL L. HILLMAN, U.S.D.J.